*S E A L*

TARPLEY v. WINN & LOVETT GROCERY CO.

Industrial Commission.

March 20, 1953.

Max Ganz, West Palm Beach, for claimant.

James C. Paine of Earnest, Lewis, Smith & Jones, West Palm Beach, for the employer.

JAMES R. KNOTT, Deputy Commissioner.

The claimant, Mrs. Janie Tarpley, was employed as a meat wrapper by Winn & Lovett Grocery Co. in West Palm Beach at an average weekly wage of $36. She claims the benefits of the Act on account of an injury alleged to have been sustained on October 9, 1951, in the course of her work. Her employer denies liability, contending (1) that she did not sustain an injury by accident; (2) that if an accident occurred it was the result of horseplay instigated by the claimant, and did not arise out of her employment; (3) that the employer was not afforded notice or knowledge regarding the alleged injury in compliance with the provisions of section 440.18, Florida Statutes 1951.

The evidence showed that the claimant sustained a back injury by accident in the course of her work on October 9, 1951, due to horseplay, and that the supervisor of her work had immediate knowledge of the accident.

The claimant contends that she was a non-participating victim of horseplay on the part of her supervisor, Ivy James, the manager of the meat department, and further that his practice of horseplay, with the risks incident thereto, had with the actual or implied knowledge of the employer become an accepted part of the employment in the meat department.

Claimant testified that she was standing by the meat counter in the employer's premises, holding some cottage cheese in her hand, when her supervisor James, approached her, grimaced, and moved as if to take the cheese out of her hand, but instead "grabbed" her in the private parts; that she lifted up her right leg in protection and he grasped her uplifted foot and yanked it, causing her to fall to the floor in a sitting position; that symptoms of neck and back injury developed, and on the following day she asked James to send her to the company physician, which he did not do. According to her testimony, she continued to work as long as possible, in spite of painful symptoms, in order to help support her family of three children; she applied for a transfer to another store, to get away from James, and obtained a transfer about January 1, 1952. She continued to work until February 2, 1952, when she gave up work on account of her condition, after which time she was examined and treated briefly by Drs. C. M. Harris, Theodore Norley and Raymond S. Roy for disabling pain at the end of her spine and in the hip and right leg. She has not been gainfully employed since the date last mentioned.

As to whether James' practice of horseplay was part of his regular course of conduct, so as to become an accepted part of the employment in the meat department, it is appropriate to quote certain portions of the testimony. The claimant testified as follows—

Did you ever have any trouble with Mr. James before October 9? — * * * He was always grabbing at you somewhere.

Grabbing at you? — Me and others, too.

Where else did he grab you? — Well, once he grabbed my breasts.

Grabbed your breasts? — That's right.

He actually grabbed them? — He actually grabbed them.

That was on one other occasion? — Yes.

On any other occasion did he grab you anywhere else? — Yes. He grabbed my leg once way up here [indicating].

Are you indicating on your upper thigh? — Yes.

On the inside of your thigh? — Yes.

Near your private parts? — That's right.

* * *

What did he tell you? — He said, "I am in heat. Can't you help me out?"

* * *

Did you observe him doing anything like that to any other girls in the place? — Yes.

Who else did he do it to? — Well, he said it to Mrs. A———.

In your presence? — In my presence.

Who else did he molest or put his hands on that you saw? — Well, I saw him get Mrs. A——— one day, walked up behind her, took her breasts—she was bent over squirming—and he didn't turn her loose until Miss D——— and I goosed him. * * *

Now, has he done that to any other girls working there? — Not this particular thing. I have seen him run his hands up Mrs. D———'s dress.

## Another female employee in the meat department testified as follows—

Did he [James] ever make any passes at you? — Yes he did.

Can you tell us about it? — Well, one time in particular I was weighing something on a scale and Mr. James came up behind me and ran his hand up my leg, and I turned around and I hit him in the stomach with all my might, and he made as though to strike back at me. * * *

Did he ever touch you on any other part of your body? — Oh, on my body? Yes. He did. He come up and flipped me like this [indicating].

You are indicating your breast; is that right? — Yes.

He actually touched them? — Yes, I would say so.

*    *    *

Who else did he do it to? — Well, there was the incident that Mrs. Tarpley mentioned with Mrs. A———. He went up behind her—and she is a rather heavy-set woman—and he grabbed her like that [indicating].

Like that. What do you mean? — Around her breasts.

Around her breasts? — Yes.

*    *    *

Are there any very young girls in the store whose names you don't have to tell us? — Yes.

What did he do to that girl? — Well, about the same thing he did to the rest of them . . . swatted her across the behind or . . .

He what? — Swatted her across the behind.

## A third female employee testified as follows—

What contact did you have with Ivy James? — Brother, where shall I start? * * * Several times when I was working stock in some of the counters, I have heard him say, when girls would come in in shorts or in "T" shirts, that he sure would like to take that to bed with him, or something like that. * * *

## A female customer of the store testified as follows—

* * * One time I was in there with my little brother and we were getting some lunch meat for the kids' lunch, and I was leaning over the counter and he [James] reached over on one side of me and grabbed me and I slapped him. He said he was tickling me.

Mrs. M———, you just put your hand on a certain part of your body. Can we have that shown on the record? What part of your body were you just touching? — Right here [indicating].

You indicated your left breast? — Yes.

How did he touch you? Did he just lay his hands on you? — He grabbed me. He did not lay his hands on me.

Did he apply any pressure to your breasts? — Yes, he did just like that.

Are you indicating a squeezing motion with your hand? — That's right.

One time I was wearing shorts and walking through the store, not even near the meat department, he said to me—"Lay down and open up your legs. I'm in heat."

The general purport of the testimony given above was corroborated by that of another female employee, a disinterested witness, although the employee identified above as Mrs. A——— testified by deposition taken in New Jersey that James was not molesting the claimant at the time she was injured, but claimant "started it by poking her cottage cheese hands in Mr. James' face."

Ivy James testified that he never molested the female employees in an offensive manner, although he punched them in the side occasionally, and they "tickled" him, because he was "ticklish." He stated that on the occasion of her injury, the claimant made as if she was playfully going to throw some cheese at him, whereupon he put his hands up and she raised her foot and "whirled around and sat down."

Medical testimony by Dr. Roy showed that the claimant sustained a contusion and sprain of the lower back at the time of her injury, with the possibility of a displaced coccyx due to her fall; that injuries of this type can cause extended disability, with the symptoms increasing with time, until proper treatment. Dr. Roy testified that claimant was disabled at the time of an examination on August 8, 1952, for the type of work which she had customarily performed in the past. He recommended a course of physiotherapy, and removal of the coccyx, if necessary.

The evidence as a whole sustains the conclusion that the claimant's injury was incurred through horseplay initiated by her supervisor, Ivy James, as part of his general custom and regular course of conduct with the female employees under him, and justifies the finding that her injury arose out of as well as in the course of her employment, so that she is entitled to the benefits of the Act. The testimony further shows that claimant has, for all practical purposes, been temporarily totally disabled since February 2, 1952.

It might be observed, in passing, that the general appearance of Mr. James gave no hint of the surging romantic longings which the testimony of the women reflected. His mild demeanor on the

witness stand did not bespeak the giddy passions, the heady abandon to Cupid, so strongly indicated by the evidence. However, common knowledge teaches us that appearances are sometimes deceptive. A wildly amorous heart doubtless flutters in many a nondescript breast, and an air of naïveté is not incompatible with a nature dedicated to Eros, the god of love.

The claimant is awarded the benefits of the Act, and it is ordered as follows—1. The employer shall pay to the claimant compensation at the rate of $21.50 per week for the period of her disability beginning February 2, 1952, less a four-day waiting period, and extending to the present time. Such payments shall continue until the same may properly be modified or terminated in accordance with the provisions of the Act. 2. The employer shall pay the expense of the medical treatment required thus far on account of the claimant's injury, and shall furnish such additional medical and other remedial treatment and care as the nature of the injury or the process of recovery may require. 3. The employer shall pay Max Ganz, Esq., the sum of $450 for his legal services in behalf of the claimant. 4. The costs of this proceeding are taxed against the employer.